IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

RONALD E. SCHERER, SR.,           :
                                  :
          Plaintiff,              :          Case No. 2:12-CV-1101
                                  :
     v.                           :          JUDGE ALGENON L. MARBLEY
                                  :
JAMES M. WILES, ESQ., *et al.*,   :          Magistrate Judge Deavers
                                  :
          Defendants.             :

## OPINION & ORDER

### I.     Introduction

This matter comes before the Court on: (1) Defendants', James M. Wiles, Esq. ("Wiles")

and Wiles, Boyle, Burkholder & Bringardner Co., L.P.A. (collectively "Defendants") Motion for

Summary Judgment on Plaintiff Ronald E. Scherer, Sr.'s ("Scherer" or "Plaintiff") legal

malpractice claim, (Doc. 51); (2) Plaintiff's Motion to Strike Portions of Defendants' Reply

Brief and to Deem as Waived as a Matter of Law Defendants' Statute of Limitations Defense,

(Doc. 63); and, (3) Plaintiff's Motion for Sanctions and Default Judgment. (Doc. 64).

For the reasons set forth below, Defendants' Summary Judgment motion is **GRANTED**;

Plaintiff's Motion to Strike is **DENIED**; and Plaintiff's Motion for Sanctions is **GRANTED in**

**part and DENIED in part**.

### II.     Background

#### A.     Factual Background

This matter originates in Defendants' representation of Plaintiff beginning in December

2004, in a lawsuit that began in December 2004. In that litigation, Bank One Trust Company,

N.A. ("Bank One"), now JP Morgan Chase Bank, N.A., as trustee under a trust agreement with

1

Plaintiff and other beneficiaries, filed a complaint in probate court to compel Plaintiff to produce information allegedly needed to prepare a final trust accounting, wind up Bank One's trusteeship, and appoint a successor trustee.  By way of background, the case ultimately begins with Plaintiff's father, Roger L. Scherer, entering into a trust agreement with Bank One dated 1979, and reinstated in 1981. Roger Scherer funded the trust with the stock of the family's wholesale magazine distribution business ("family business").        After Roger Scherer died in April 1982, the Scherer trust was divided into three subtrusts ("family trust"): (1) a trust for Roger's son, Ronald E. Scherer, Sr. (2) a trust for Roger's daughter, Linda Scherer Talbott ("Talbott"), and (3) a "wife and mother trust" for Roger's surviving spouse and his mother. The trusts' terms established income beneficiaries with distribution benefits, as well as remainder beneficiaries. The income beneficiaries are the named beneficiaries for each trust. The principal assets conveyed to the trust upon Roger's death consisted of, directly or indirectly, the stock of entities engaged or affiliated with his wholesale magazine, as well as real estate separately owned but used by these companies.

Upon their father's death, and pursuant to their father's desire, Scherer and Talbott became the chief executives in charge of day-to-day operations of the family business. In addition, in 1985, the original trust advisors resigned, and appointed Scherer and Talbott as successors pursuant to the terms of the trust agreement. Scherer served as trust advisor until the court removed him in 2008, at which time Scherer, Jr., Scherer Sr.'s son, become trust advisor; Talbott served as trust advisor until 2002. As trust advisor, Scherer had veto power over some of Bank One's actions, and the ability to block Bank One from voting shares of the trust-owned corporations, thereby precluding Bank One, as shareholder, from removing Plaintiff as an officer and director of the trust-owned family businesses. As chief officer and director of the trust-

owned family businesses, Scherer and Talbott had a fiduciary duty to provide financial information and account to Bank One, as shareholder, and Bank One was fully dependent upon them to report to Bank One regarding operations.

Beginning in 1986, Scherer's relationship with Bank One deteriorated as a result of Scherer's alleged failure to provide financial information about the family business to Bank One, as trustee. In the late 1980s, Scherer refused to provide information because he was going through a divorce and he did not want his wife to have financial information. In 1990, Bank One proposed the election of more cooperative directors for the trust-owned companies, and Scherer and Talbott refused. As a result, in 1994, Bank One filed a lawsuit against Scherer in the Franklin County, Ohio, Probate Court for Scherer's alleged refusal to turn over the relevant information about the family business. *Bank One Trust Co., N.A. v. Ex'r of Roger L. Scherer Estate,* No. 430379A. That litigation was settled in 1995 when the parties entered into a Non–Disclosure Agreement, which required Scherer to disclose the information previously requested by Bank One, and to do so on "an ongoing basis and in a timely manner."

Most of the 2004 probate litigation arose from the demise of the family magazine distribution businesses. The first step to that end took place in 1990, when Ronald Sr. sold the distribution business assets of one of the magazine distribution businesses, and invested most of the proceeds in the stock of another business that he ran, National Wholesale Drug Co., which up to that point was not among the trust assets. By 1993 National Wholesale Drug was defunct and its trust-owned stock worthless.

The most significant transaction, however, took place in February of 1998, when Scherer, in an attempt to cope with changes in the periodical distribution business, combined the remaining family businesses with comparable other regional magazine distributors into a larger

3

entity known as Unimag. After the Unimag transaction closed, the Scherer and Talbott trusts each owned large quantities of Unimag stock and debentures, as well as the shares of the surviving family companies, now stripped of their magazine distribution assets but still in possession of real estate and other property. The Unimag transaction was unsuccessful, however, and Unimag ceased operations within months and its stock became worthless.

After the demise of Unimag, Scherer refused to provide Bank One with information concerning the Unimag transaction, and remaining assets of the companies owned by the family trust. Bank One retained the Vorys law firm to attempt to obtain the information. Because of continued failures to obtain the necessary information, Bank One, with Vorys' assistance, began the process of resigning as trustee. In November 2003, after failed attempts to work with the chief financial officer of the Scherer businesses, Bank One retained the law firm Zeiger, Tigges & Little, LLP to assist in obtaining satisfactory information to prepare a final trust accounting of the trust's remaining assets. In February 2004, Bank One provided Scherer with a comprehensive request for information. Scherer not only failed to put a hold on his three-year document destruction policy, but also failed to provide Bank One with any of the requested information.

### 1. The Probate Action and Appeals

In September 2004, Bank One filed a declaratory judgment action against Scherer and the other family-trust beneficiaries in the Franklin County, Ohio, Probate Court ("Bank One litigation") in an effort to compel Scherer to produce the information needed to prepare a final trust accounting, wind up Bank One's trusteeship, and appoint a successor trustee.

In January 2006, Scherer and the other trust-beneficiaries filed a counterclaim against Bank One, asserting eight separate causes of action, including: breach of fiduciary duty, breach of trust agreement, defamation, fraudulent concealment, tortious interference of beneficiaries'

4

right sand interest in trust assets, and a claim for rescission of the 1985 letter concerning management of the Family Business.

In February 2006, Bank One filed a "Further Claim and/or Third–Party Complaint" against Scherer, personally, alleging Scherer breached his fiduciary duty as the person in charge of the family business by failing to provide required information by Bank One, and a conversion claim against Scherer, personally, alleging he had conveyed various trust assets to himself or companies he controlled without informing the trustee or seeking approval.

### a. Discovery Sanctions

On December 10, 2004, Bank One served Scherer with a document-production request, but Scherer did not respond. Accordingly, on two separate occasions in 2005, Bank One filed motions to compel discovery from Scherer, but did not receive the requested documents.

Scherer and other trust beneficiaries were originally represented by Michael J. Cassone, William L. Willis, Jr., and W. Vincent Rakestraw. On December 20, 2005, the probate court entered an order finding Scherer had failed to comply with discovery requests and ordered Scherer to comply by January 13, 2006. The court also warned Scherer that failure to comply would result in a contempt charge and a fee of $250 per day until he complied. Finally, the Court found defendants' attorneys, who had previously filed motions to withdraw, in contempt for misrepresentations to the court. *Bank One Trust Co. v. Scherer*, 2006-Ohio-5097, ¶ 1.

On December 22, 2005, the Wiles Firm, the Defendants in this action, filed their appearance on behalf of the defendants in the Bank One litigation, i.e. all beneficiaries to the family trust. In January 2006, the Wiles Firm filed an answer and eight breach of fiduciary duty counterclaims on behalf of Scherer and the other trust beneficiaries.

As the Ohio court of appeals noted, "[d]ue to continued battles over access to information regarding the family businesses and their assets, the litigation in [the Bank One litigation] reflects frequent discovery clashes between opposing counsel and, more significantly, between counsel for Ronald Sr. and the assigned trial judge." *Bank One Trust Co. v. Scherer*, 2009-Ohio-6192, ¶ 16.

By April 2006, Scherer had still failed to comply with the discovery order. The court gave him another chance to produce certain specific categories of documents by April 27, 2006. Scherer again did not comply. In June 2006, the court reminded Scherer that he remained in contempt and that the daily fine was continuing. Plaintiff argues that the court was mistaken that Mr. Scherer was in contempt, and that it was his prior attorney, instead, who was in contempt of court. Regardless, Bank One filed its third motion to compel on July 25, 2006. The court granted that motion on August 30, 2006, finding the defendants in blatant violation of the discovery process.

On October 6, 2006, the Court held a show cause hearing as to why Scherer should not be held in contempt and sanctioned. On the record, the trial court admonished Wiles for inappropriately interrupting Scherer 94 times in 80 transcript pages during his deposition, as well as admonished Wiles for his complete lack of effort on behalf of the defendants to respond to interrogatories. As a result, in a February 1, 2007 judgment entry, as a discovery sanction the court dismissed all of the defendants' counterclaims with prejudice. The same entry reduced to judgment the $250 per day for discovery noncompliance, beginning January 13, 2006, and ordered defendants to pay $74,750 to Bank One as well as $250 per day for each day the judgment remained unpaid. The Tenth Circuit Court of Appeals affirmed. *Bank One Trust Co. v. Scherer*, 2008-Ohio-2952, 176 Ohio App. 3d 694, 893 N.E.2d 542.

During an April 2007 show cause hearing, the court addressed whether sanctions were warranted as a result of the repeated and ongoing difficulties in scheduling and completing the depositions of David Thompson and Kenneth Dean, the inside accountants for the various Scherer companies. Plaintiff alleges that neither deposition was completed timely nor sufficiently because of the Wiles firm's failure to coordinate them in a timely manner neither. In addition, during these depositions Wiles made frequent objections, such that Dean's deposition had to be terminated. At the show cause hearing, the judge stated that "In 32 years as a lawyer and 20 years as a judge, I have never seen less cooperation. It is just absolutely absurd. Mr. Wiles' conduct throughout has been reprehensible, inexcusable, and contemptible. He has demonstrated clearly no regard for the law, no regard for the Court and little for his own clients. This is a sad, sad scenario." As a result of the discovery misconduct, the probate court precluded the defendants, meaning all beneficiaries, from presenting the testimony of the two accountants, Dean and Thompson. Moreover, the probate court precluded defendants from offering any evidence at the hearing or trial regarding proposed testimony on Exhibit A to the court's order, which included many of the specific transactions that were the subject of Bank One's conversion claim against Scherer. Scherer claims that such precluded testimony regarding transactions listed in Exhibit A would have provided the factual foundation for the defendants' expert CPA witness to defend against the conversion claim. In addition, due to the argumentative discourse which took place between the trial court and Wiles, the trial court found Wiles in direct criminal contempt of court and sentenced him to ten days' incarceration.

In a June 8, 2007 order the court commented:

> And I think it is quite fair to say that defense counsel has complied with no order
> from this Court throughout. I think it is clear that defense has done nothing in this
> case but stonewall the proceedings, try to delay the proceedings, to try to hold up

the Court to get to the ultimate issues in this case. That is disgraceful, deplorable, unprofessional.

**b. August 2007 Trial**

The probate case was tried by bench trial in August 2007. The court issued its 60–page decision on May 14, 2008. *Bank One Trust Co., N.A. v. Scherer,* No. 430379–C. Bank One sought approval of its accounting, and a judgment in excess of $6.2 million against Scherer, Sr. for conversion of assets. The court struck most of the beneficiaries' objections to the final accounting on the basis that the objections were attempts to restate the previously stricken counterclaims. The court further adhered to its prior rulings prohibiting certain evidence concerning Exhibit A.

The court found that according to Bank One's accounting, beginning in 1999 Scherer had misappropriated $6,202,623.00 of trust assets over the course of seven years. The court listed the unauthorized transactions verbatim from Bank One's evidentiary submission. Those transactions were the same ones which the court barred Scherer from providing rebuttal evidence. The court concluded that these transactions "depleted the value of the Scherer Family Business and diverted millions of dollars of cash and other assets that should have been paid to the Trustee on behalf of [the Trusts]." Additionally, Scherer "knowingly impeded [Bank One's] ability to perform the very functions that [he] alleges [Bank One] failed to fulfill despite its diligent efforts to do so: to actively manage the assets of the [Trusts], to monitor or diversify trust assets, to discover sooner Mr. Scherer's ... misappropriation of Trust assets, to prepare full and accurate trust statements and accountings, and to prepare accurate trust tax returns."

With respect to Scherer's late counterclaims against Bank One for misrepresentation and abuse of process, the court stated, "[c]ontrary to [Scherer's] allegations, [Bank One's] final accountings do not contain misrepresentations, and [Bank One's] preparation and filing of the

8

final accountings was not done with an ulterior purpose or in an effort to use court procedures to accomplish a purpose for which they were not designed." Further, "[e]ach of [Bank One's] final accountings, as supplemented, is true, accurate, and complete. Even if ... the final accountings are inaccurate and incomplete ... any such deficiencies were caused by the repeated refusal of [Scherer] ... to provide information to [Bank One] despite its repeated and diligent efforts to obtain the information...."

The court held that Scherer breached his fiduciary duties as an officer and director of the family business and entered judgment against Scherer for $6,202,623.00 plus interest. It also held that "[a]ny further objections to [Bank One's] final accountings, and any and all claims against [Bank One] arising from or relating to its final accountings, its administration of the Trusts, or any other matters pertaining to the Trusts and Trust Agreement are hereby adjudicated and hereafter barred."

### c. 2009 Appeal

Scherer and the other beneficiaries appealed the judgment against them. On November 24, 2009, the Ohio court of appeals unanimously affirmed both the $6,202,623.00 judgment against Scherer for improper diversion of trust assets and the dismissal of Scherer's January 2006 counterclaims as a discovery sanction. *Bank One Trust Co., N.A. v. Scherer,* 2009 WL 4049123 (Ohio Ct. App. Nov. 24, 2009). The appeals court explained that the evidence "was nearly one-sided in support of the probate court's factual conclusions regarding unauthorized transactions." *Id*. at * 14.

The court reversed, however, the probate court's decision to strike Scherer's co-beneficiaries' counterclaims, reasoning that such sanctions were based "principally and most egregiously on Ronald Sr.'s misconduct during discovery." *Id* at *13. The court further

concluded that the decision to strike the beneficiaries' objections to the final accounting was erroneous because it was predicated on the rationale that the objections were a guise for litigating the stricken counterclaims. *Id.* Thus, the appeals court remanded the case for resolution of the all beneficiaries' counterclaims, but Scherer's (although the other beneficiaries' counterclaims were identical in all respects to Scherer's excluded counterclaims), and also for a new final accounting as to all of the beneficiaries, including Scherer. *Id.* at *16.

### d. Post Remand Proceedings

After remand, Scherer and all other beneficiaries retained the Chorpenning Firm on July 19, 2010, to litigate the counterclaims and objections to the final accounting. *Remand Proceedings, Defendants' Exhibit G*, at p. 36, ¶ 128. In its findings of fact and conclusions of law following the trial, the probate court also documents a hearing held on March 24, 2011, in which it addressed potential conflicts of interest arising from defense counsel's representation of both Scherer and the other beneficiaries.

### i. March 2011 Conflict of Interests Hearing

At the March 24, 2011 hearing, the court found that all defendants executed a Conflict of Interest Waiver Agreement which stated the following:

> The Beneficiaries have determined that it is in their collective best interests to appoint a representative to interact with, receive information from, and to help plan and coordinate strategy during the Litigation with [defense counsel]. The Beneficiaries have appointed Ronald E. Scherer, Sr., to perform these functions. . . . By signing this Waiver of Conflict, each of the Beneficiaries has affirmed their selection of Ronald E. Scherer, Sr. to represent each of them as intermediary with [defense counsel.].

*Id*. at p. 37, ¶ 129. The court found that all defendants to the remand proceedings were aware of the merits judgment against Scherer, the Contempt Judgment against him, and his disobedience. Further, all defendants represented to the Court that they had agreed among themselves that they

did not want the successor trustee, Park National Bank, to collect the Merits Judgment or Contempt Judgment against Scherer. Further, the successor trustee agreed not to collect such Judgments. The Court concluded that despite the grounds for the Merits Judgment and Contempt Judgment against Scherer, and having been fully apprised of their rights, all defendants "ha[d] voluntarily agreed to stand by their father [and brother] in this action in all respects so that there is complete commonality of interests among [themselves], acting as 'one family,' " and/or as "a unified group …with a common purpose" and "common interest." *Id*. at p. 39, ¶ 139-41. The court, therefore, found no conflict of interest and approved the Chorpenning Firm to represent all trust beneficiaries, including Scherer, in the 2011 Trial.

After that hearing, all Defendants jointly filed their Objections to Plaintiff Bank One Trust Company, N.A.'s Final Accounting.

### ii. July 2011 Trial

The probate court held a new trial on the accuracy of Bank One's final accounting and original counterclaims filed by the Wiles firm, with Scherer serving as the beneficiaries' representative on all matters. The court issued its decision on December 1, 2011. *Bank One Trust Co., N.A. v. Ronald E. Scherer,* No. 430379–C, Defendants' Exhibit G.

Defendants called a single witness, and only expert witness, Alan Acker. The court found that his testimony lacked credibility. In contrast, the court found Bank One's two expert witnesses to be credible. The court held in favor of Bank One on all counterclaims, approved Bank One's final accounting, and confirmed the $6.2 million dollar judgment against Scherer. Specifically, the court found the following of defendants' counterclaims factually meritless: (1) breach of fiduciary duty; (2) breach of trust agreement; (3) negligence; (4) tortious interference with business relationships; (5) defamation; (6) fraudulent concealment; (7) tortious interference

11

with the beneficiaries' rights and interests and constructive fraud; (8) rescission of the 1985

delegation instrument. The Court also determined that the defendants' counterclaims relating to

investments in National Wholesale Drug Company and Unimag were time-barred.

Finally, in terms of the final accounting, the underlying transactions of which comprised

the $6.2 million judgment against Scherer, Sr. the trial court determined the following:

> [i]n Defendants' objections and exceptions to the Final Accounting, all
> Defendants, including Scherer, Sr. object to the entries in the Final Accounting
> indicating that Scherer, Sr. misappropriated and wrongfully diverted
> approximately $6.2 million of the Trust assets. Defendants assert that Scherer, Sr.
> 'didn't misappropriate anything.' In response to Defendants objection, Bank One
> presented additional evidence at the July 2011 trial supporting its accounting for
> Scherer, Sr.'s unauthorized transactions. At the July 2011 trial, all Defendants had
> a full and fair opportunity to present evidence in support of their assertion that
> [Plaintiff] did not misappropriate Trust assets or otherwise engage in unauthorized
> transactions, but they failed to do so. Defendants could have called Scherer, Sr. as
> a witness to explain these transactions, but they did not do so. Defendants could
> have called David Thompson or Kenneth Dean, the Family Business' accountants
> during many of the years in question, or any other person with knowledge, to
> explain these transactions, but Defendants did not do so. Defendants could have
> presented additional financial documents from the Scherer Family Business
> regarding these transactions, but they did not do so. Upon consideration of the
> totality of the evidence offered at the August 2007 trial and the July 2011 trial,
> and the credibility and demeanor of all witnesses, the Court finds that Bank One
> accounted for these unauthorized transactions and that [Plaintiff] did, in fact,
> misappropriate and wrongfully divert $6,202,623 of Trust assets.

*Id.*, at p. 67, ¶ 230. Thus, the trial court approved Bank One's final accounting, resolved all

original counterclaims—including Scherer's latter counterclaims alleging Bank One committed

fraud on the court—in favor of Bank One, and generally confirmed all of Bank One's actions as

trustee as legitimate and appropriate.

### 2. 2011 Federal Case

On July 18, 2011, the first day of the probate court's proceedings, Scherer, individually,

brought an action in federal court under the Fair Debt Collection Practices Act ("FDCPA")

against JP Morgan Chase, successor to Bank One. The district court found, and the Sixth Circuit

affirmed, that Scherer was collaterally estopped from litigating his FDCPA claim because certain factual predicates had been fully and fairly litigated and determined during the probate action that prevented him from making out his FDCPA claim 2008. *Scherer v. JP Morgan Chase & Co.*, 508 F. App'x 429 (6th Cir. 2012). The Sixth Circuit reasoned that "all of Scherer's claims are premised on his assertion that the bank used false statements, and otherwise engaged in false or deceptive representations, to establish that Scherer stymied discovery and diverted millions of dollars in assets from the Trusts. These factual predicates to Scherer's claims were clearly resolved by the probate court." *Id.* at 438.

### 3. Malpractice Allegations

Scherer sets forth the following as evidence of the Defendants' negligence in representing him, as well as evidence that such misconduct directly led to discovery sanctions, including dismissal of all of his counterclaims in the 2008 trial, and exclusion of Dean's, Thompson's, and his testimony to rebut the final accounting:

- Failure to seek document discovery and depositions of the Vorys law firm, trustee's former counsel, which would have demonstrated Bank One, in fact, was in possession of all documents it otherwise claimed were lacking;

- Repeated legally infirm and baseless objections to interrogatories and document requests;

- Repeated legally infirm and baseless objections during depositions of Scherer, Thompson and Dean;

- Misleading opposing counsel and the Court as to the availability and status of Unimag documents;

- Lack of organization of discovery, missing documents in discovery;

- Failure to produce documents to opposing counsel, which Plaintiff, in fact, did produce to Mr. Wiles; and

- Failure timely to schedule depositions of Plaintiff's accountants, Dean and Thompson, let alone inform the accountant witnesses of the depositions.

Consistent with Ohio law, Plaintiffs submitted an expert report delineating Defendants' breaches of the standard of care. (Response, Ex. 19).

## B.       Procedural Background

Plaintiff filed a complaint on November 30, 2012, and an amended complaint on September 9, 2013, asserting legal malpractice. Defendants answered the first complaint on February 8, 2013, and also filed a counterclaim. Defendants filed a Motion for Summary Judgment on September 19, 2013 asserting a statute of limitations defense. On September 2, 2014, this Court denied summary judgment on those grounds. On April 9, 2015, Defendants filed this Motion for Summary Judgment on collateral estoppel grounds. This matter has been fully briefed and is ripe for review.

## III.    Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides, in relevant part, that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson,* 477 U.S. at 251-52). In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party. *United States S.E.C. v. Sierra Brokerage Servs.,*

*Inc.*, 712 F.3d 321, 327 (6th Cir. 2013). The court reviewing a summary judgment motion need not search the record in an effort to establish the lack of genuinely disputed material facts. *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 404 (6th Cir.1992).  Rather, the burden is on the nonmoving party to present affirmative evidence to defeat a properly supported motion, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989), and to designate specific facts that are in dispute. *Anderson*, 477 U.S. at 250; *Guarino*, 980 F.2d at 404–05.

To survive the motion, the nonmoving party must present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 339-40 (6th Cir. 1993). The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient to survive the motion; there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson,* 477 U.S. at 251; *Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir. 1995); *see also Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir. 1992) (finding that the suggestion of a mere possibility of a factual dispute is insufficient to defeat a motion for summary judgment) (citing *Gregg v. Allen-Bradley Co.,* 801 F.2d 859, 863 (6th Cir. 1986)).

### IV.    Analysis

The Defendants argue that summary judgment is warranted as to Plaintiff's legal malpractice claim because Plaintiff is collaterally estopped from proving the causation element of his claims: but for Defendants' breaches, he would have prevailed in the Bank One litigation. Defendants contend that the final accounting conducted at the 2007 and 2011 trials establish that Plaintiff did misappropriate $6.2 million, which is the basis of the adverse judgment against him from the 2007 trial; further, the 2011 trial disposed of the other family trust beneficiaries'

counterclaims in Bank One's favor, which were exactly the same counterclaims Plaintiff would have brought but for the discovery sanctions.

Plaintiff responds that collateral estoppel is not applicable. Plaintiff also brings a Motion to Strike portions of Defendant's reply brief, and a Motion for Sanctions, which this Court will address in *seriatim*.

## A.      Legal Malpractice Claim

For Plaintiff to succeed on his legal malpractice claims related to Defendants' representation of him during the Bank One litigation, Plaintiff must show three essential elements: (1) an attorney-client relationship such that the attorney owed a duty to the plaintiff; (2) breach of the attorney's duty by not conforming to the standard required by law; and (3) a causal connection between the conduct complained of and resulting damage or loss. *Capital City Energy Grp., Inc. v. Kelley Drye & Warren, LLP*, 975 F. Supp. 2d 842, 851 (S.D. Ohio 2013) (Marbley, J) (citing *Stancik v. Hersch,* No. 97501, 2012–Ohio–1955, 2012 WL 1567213, at *5 (Ohio Ct. App. May 3, 2012) (quoting *Vahila v. Hall*, 77 Ohio St.3d 421, 674 N.E.2d 1164, 1169 (1997))).

Defendants dispute only that Plaintiff is able to satisfy the third element of his legal malpractice claim—the causation element. Thus, in order to prove damages, which is dispositive of Plaintiff's right to recover for any alleged malpractice, "the plaintiff must show he/she had a valid claim or defense. Of course, to satisfy the proximate causation requirement, the plaintiff must show that, but for the attorney's negligence, the plaintiff would be in a more favorable position, *i.e.,* once again that the plaintiff had a valid claim or defense." *Stoklosa v. McGill*, No. L-91-028, 1992 WL 32088, at *3 (Ohio Ct. App. Feb. 21, 1992). This requirement is better known as the "suit within a suit" doctrine. *Id.* at *3. In *Environmental Network*, the Ohio

16

Supreme Court clarified that the "suit within a suit doctrine" applies if the theory of the malpractice case places the merits of the underlying litigation directly in issue. *Envtl. Network Corp. v. Goodman Weiss Miller, L.L.P.*, 2008-Ohio-3833, 119 Ohio St. 3d 209, 893 N.E.2d 173, 176-78 (finding that since the Plaintiff had to establish that the attorney's actions resulted in settling the case for less than it would have received had the case gone to trial in order to succeed on the causation element of the legal malpractice standard, the malpractice case involved the case-within-a-case doctrine). In this type of case, as opposed to one in which the plaintiff can show it sustained some loss regardless of any eventual outcome of a case, *see Vahila*, 77 Ohio St.3d at 674, "it is insufficient for the plaintiff to present simply 'some evidence' of the merits of the underlying claim." *Id.* at ¶ 19. Instead, the plaintiff must establish that he would have been successful in the underlying matter but for the attorney's negligence. *Id.*; *see also, e.g.*, *McCarty v. Pedraza*, 2014-Ohio-3262, ¶¶ 14-27, 17 N.E.3d 71, 77-80 (applying the suit-within-in-suit doctrine, and not the "some evidence" standard, where appellees' sole theory for recovery was that if the underlying matter had been tried to conclusion, they would have received a more favorable outcome than they obtained in the settlement). Generally, "[t]he issue of proximate cause is ... a question of fact and is therefore a matter for the jury." *Morris v. Morris,* Case No. 21350, 2003–Ohio–3510, 2003 WL 21509023 (Ohio Ct.App. Jul. 2, 2003) (citing *Farlow v. Board of County Cmmrs.,* 9th Dist. Nos. 2812, 2813, at 11, 1979 WL 207611 (Ohio Ct.App. Apr. 18, 1979)); *Platinum Fin. Servs. v. Gurney,* 69481, 1996 WL 631095, at *11, 1996 Ohio App. LEXIS 4802, at *29 (Ohio Ct.App. Oct. 31, 1996)).

All parties and this Court agree that Plaintiff's claim puts the merits of the underlying case directly at issue, and thus that the case-within-a-case doctrine applies: Plaintiff maintains that but for Defendants' breaches, which led to certain discovery sanctions, he would have been

able to try and prevail on his counterclaims, and utilize excluded evidence which would have permitted him to defended successfully against the adverse $6.2 judgment. Thus, in order to succeed on summary judgment, Defendants must prove there are no disputed facts regarding whether Plaintiff could have prevailed on any of his counterclaims, or successfully defended against a $6.2 million judgment, but for Defendants' alleged negligence.

Defendants argue that Plaintiff cannot prove the causation element of the malpractice under the doctrine of collateral estoppel. Specifically, Defendants contend that: (1) Plaintiff is collaterally estopped from proving anyone but he is the proximate cause of the $6.2 million judgment against him because that issue was fully litigated in 2007, and then the Federal District Court for the Southern District of Ohio affirmed that the $6.2 million judgment was "final in all respects necessary for proper application of the doctrine of issue preclusion" in the subsequent FDCPA claim against JP Morgan Chase; (2) the record in the Bank One litigation shows that the probate court held that Plaintiff was the direct and proximate cause of the discovery sanctions resulting in the dismissal of all counterclaims; and (3) Plaintiff directed and controlled the prosecution of the original counterclaims in the July 2011 trial, and a new final accounting of the family trust, with new counsel, and lost—thus, he is collaterally estopped from attempting to prove he would have been successful on his counterclaims and in defending against the $6.2 judgment in the 2007 trial, but for Defendants' negligence.

Plaintiff responds that for collateral estoppel to apply, precisely the same issue must have been previously litigated and decided; since the issue of whether Defendants' conduct with respect to their representation of Plaintiff has never been decided, Plaintiff argues he is not precluded from pursuing his former counsel for legal malpractice. Plaintiff adds that since there is no dispositive assertion that either his counterclaim or his defense to the conversion claim is

devoid of factual dispute warranting summary judgment under Fed. R. 56, he does not have the burden to demonstrate genuine issues of material fact exist on those matters. Thus, the only dispositive contention on summary judgment is whether collateral estoppel bars Plaintiff's legal malpractice claim. Further, Plaintiff argues that collateral estoppel cannot apply because Defendants were not parties to the Bank One litigation, and/or Plaintiff was not in privity with the other beneficiaries' in pursuit of their counterclaims during the 2011 trial.

The Court must determine, therefore, whether collateral estoppel bars Plaintiff's legal malpractice claim.

### 1. Application of Collateral Estoppel to the Causation Element of Plaintiff's Legal Malpractice Claim

Federal courts must give the same preclusive effect to a state-court judgment as that judgment receives in the rendering state. *Abbott v. Michigan,* 474 F.3d 324, 330 (6th Cir.2007) (citing 28 U.S.C. § 1738). Accordingly, federal courts must look to the law of the rendering state to determine whether and to what extent the prior judgment should receive preclusive effect in a federal action. *Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 81, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984). Thus, in this case the Court looks to Ohio law to determine the preclusive effect on this legal malpractice claim of the facts and issues litigated and reduced to final judgments in the 2007 and 2011 Bank One trials and proceedings.

In Ohio, "[t]he doctrine of res judicata encompasses the two related concepts of claim preclusion, also known as res judicata or estoppel by judgment, and issue preclusion, also known as collateral estoppel." *O'Nesti v. DeBartolo Realty Corp.,* 113 Ohio St.3d 59, 2007-Ohio-1102, 862 N.E.2d 803, ¶ 6. The doctrine of "[c]laim preclusion prevents subsequent actions, by the same parties or their privies, based upon any claim arising out of a transaction that was the subject matter of a previous action," while the doctrine of issue preclusion, or collateral estoppel,

"precludes the relitigation, in a second action, of an issue that had been actually and necessarily litigated and determined in a prior action that was based on a different cause of action." *State ex rel. Nickoli v. Erie MetroParks*, 2010-Ohio-606, ¶ 21, 124 Ohio St. 3d 449, 453, 923 N.E.2d 588, 592. Thus, claim preclusion, or collateral estoppel is the doctrine at issue in this case, as the Defendants seek to preclude the relitigation in this legal malpractice action of the actually and necessarily litigated issues related to the counterclaims and final accounting in the prior probate action.

In Ohio, collateral estoppel applies when: (1) the fact or issue was actually and directly litigated in the prior action; (2) the fact or issue was passed upon and determined by a court of competent jurisdiction; and (3) the party against whom collateral estoppel is asserted was a party in privity with a party to the prior action. *Daubenmire v. City of Columbus,* 507 F.3d 383, 389 (6th Cir.2007).

### a. Same Issues

To resolve the question of whether the collateral estoppel doctrine precludes relitigation of the proximate cause, or case-within-a-case, element of the Plaintiff's legal malpractice claim, the Court must divide the inquiry into two parts. First, the Court must consider the preclusive effect of issues and facts actually and directly litigated in the 2007 trial—in which the Defendants represented the Plaintiff. Then, the Court must consider the preclusive effect of issues and facts actually and directly litigated in the 2011 trial—in which the Plaintiff was represented by new counsel, and was unencumbered by any discovery sanctions allegedly caused by Defendants.

### i.     2007 Trial

This Court finds it inappropriate to invoke collateral estoppel to prevent Plaintiff from relitigating the $6.2 million judgment on the basis of the outcome of the 2007 trial; putting the 2011 trial aside, it is a question of disputed fact whether Defendants' alleged negligence contributed to the adverse judgment in the 2007 trial. In *Gray v. A.C. Strip* No. C2-99-62, 2002 WL 193696 (S.D. Ohio Jan. 29, 2002) *aff'd sub nom. Gray v. Strip*, 57 F. App'x 251 (6th Cir. 2003) and *Accelerated Sys. Integration Inc. v. Ritzler, Coughlin & Swansiger, Ltd.*, 2012-Ohio-3803 both courts declined to collaterally estop the plaintiffs from proving the causation elements of their legal malpractice claims—i.e. relitigating their underlying claims within the case-within-a-case framework—simply because the litigants had lost the underlying cases in which they were represented by the allegedly negligent counsel. In both cases the plaintiffs alleged that the attorneys' malpractice caused the unfavorable disposition of facts or issues in the underlying litigations. Both courts found that because the defendants' negligence in the underlying litigation had not been decided, use of collateral estoppel was inappropriate. *Ritzler*, 2012-Ohio-3803, ¶¶ 37-39; *Gray*, 2002 WL 193696, at *4-5. In *Gray*, however, the Court ultimately granted summary judgment because although the plaintiff argued that but for her attorney's negligence, she would have prevailed in her underlying litigation, the Court found she failed to meet her burden of providing some evidence establishing the merits of her underlying claim. 2002 WL 193696, at *6.

As in *Gray* and *Ritzler*, had the Bank One litigation ended after the 2007 trial, genuine issues of material fact would have remained concerning whether the Defendants were the proximate cause of the discovery sanctions that precluded all of Plaintiff's counterclaims from being tried in the August 2007 trial, and thus whether Defendants were the proximate cause of

Plaintiff's damages.[1] This open-ended question would have prevented this court from giving preclusive effect to the issues and facts resolved in the Bank One litigation. Further, genuine issues of material fact would exist concerning whether, but for Defendants' negligence, Plaintiff could have shown he had not misappropriated $6.2 million. For instance, Plaintiff claims that had Wiles' behavior not led to the exclusion of testimony regarding Exhibit A, which allegedly corrected Bank One's version of the final accounting, Plaintiff could have shown he had not misappropriated the funds. In sum, Defendants inappropriately attempt to apply collateral estoppel to issues and facts resolved while the Wiles firm still represented the Plaintiff, and for which genuine issues of material fact remain as to whether the Wiles firm contributed to the disposition of those facts and issues. Further, without the hindsight of the 2011 trial, Plaintiff points to evidence that he states would support the merits of his defense to the $6.2 million judgment, which Defendants do not directly contest.

Further, Defendants misconstrue the effect of the court's determination in *Scherer v. JP Morgan Chase & Co.*, 2011 U.S. Dist. LEXIS 149585. Defendants assert that the facts and issues resolved in the 2007 trial had preclusive effect over the FDCPA claim, which leads to the conclusion that the facts and issues resolved in the 2007 trial have the same preclusive effect in the context of this legal malpractice claim. This is erroneous. As explained *supra*, the court in *Scherer v. JP Morgan* did not need to consider whether the Wiles' firm negligently caused the outcome in the Bank One litigation.

---

[1] This is presuming that the plaintiff could point to facts in the record on summary judgment showing that had the attorney not been negligent, plaintiff could have succeeded in his or her claim. In their briefing the Defendants do not argue that Plaintiff could not have been successful in his claim regardless of any negligence, and thus they do not place a burden on Plaintiff to point to facts showing he did not owe $6.2 million or could have succeeded on his counterclaims. Instead, Defendants only argument on summary judgment is that the final judgments from the 2007 and 2011 trials preclude Plaintiff from arguing he could have succeeded on his claim.

Thus, if the 2007 trial were the final disposition of all facts and issues in the Bank One litigation, it would be in error to find those litigated facts and issues have preclusive effect for the purpose of Plaintiff proving the causation element of his legal malpractice claim. As the Plaintiff suggests, if every final judgment allegedly adversely affected by the representation of negligent counsel had preclusive effect for the purposes of proving the causation element of the legal malpractice standard, the legal malpractice claim that puts the final disposition of a case would cease to exist.

That is not where this case ends, however. Instead, the Plaintiff and his co-beneficiaries were given a complete second bite at the apple in the 2011 trial. They litigated precisely the same accounting issue which led to the adverse judgments against Plaintiff in the first trial, but with completely new counsel and unaffected by any discovery sanctions that Defendants' negligence arguably caused. In addition, they had a full and fair opportunity to litigate their counterclaims; though Plaintiff was excluded from litigating the claims on his own behalf, as explained below, Plaintiff was in privity with the other beneficiaries. Thus, unlike in *Gray* and *Ritzler*, Plaintiff cannot show that the Defendants' negligence contributed to the damages for which he seeks reimbursement because the findings of the 2011 trial have preclusive effect here.

### ii.     2011 Trial

When issues are fully and fairly litigated in prior litigation, and there is no allegation that the defendant attorney's alleged malpractice could have negatively affected the factual and legal findings in that prior litigation, collateral estoppel can determine the causation element of legal malpractice when the factual inquiry on which causation turns is the same as an issue determined in the prior litigation or in a related case. *Woodrow v. Heintschel* 2011-Ohio-1840, ¶¶ 22-28, 194 Ohio App. 3d 391, 397-99, 956 N.E.2d 855, 860-61; *Marasco v. White*, No. 20070998-CA, 2008

UT App 427 (November 28, 2008). Thus, since Plaintiff, represented by new counsel, fully and fairly litigated the final accounting and counterclaims in the 2011 trial, collateral estoppel determines the causation element in this case. Plaintiff, therefore, is estopped from arguing that but for the Defendants' negligence, he would have prevailed on his counterclaims or defeated the $6.2 million judgment, and his legal malpractice claim fails.

Defendants rely on *Marasco v. White*, No. 20070998-CA, 2008 UT App 427, 2008 WL 5051984 (November 28, 2008), which supports this Court's conclusion. In *Marasco*, the plaintiff retained an attorney to help her recover real property conveyed by quitclaim deed to her son. *Id.* at *1. She asserted that her attorney failed to file timely her complaint. *Id.* By the time she retained substitute counsel to file her complaint her statute of limitations had run as to her fraud and mistake claims. *Id.* The substitute attorney raised the claim, nonetheless, but the court found that it was time-barred. *Id.* In a malpractice case against the first attorney, Marasco had to prove that but for the attorney's failure to file timely, she would have won her fraud and mistake claim. *Id.* The court presiding over her legal malpractice claim found that the court in the underlying litigation found that the statute of limitations barred her from litigating her fraud and mistake claims in the underlying litigation, and also made the binding factual findings and legal conclusion that she had not conveyed the property out of ignorance or misunderstanding. *Id.* at *2. The court in her malpractice claim held, therefore, that the finding in the prior litigation that she had not conveyed the property out of misunderstanding was fatal to her ability to prove an essential element of her fraud and mistake claim. The court collaterally estopped her from relitigating the fraud and mistake claim in order to satisfy the proximate cause element of her legal malpractice claim. *Id.* at *2-3. Since the loss of her fraud and mistake claim was the only harm that allegedly befell her due to her first attorney's negligence, and she was collaterally

24

estopped from arguing she would have won those claims but for her attorney's negligence, she could not sustain her malpractice action. *Id*. at *3.

In *Woodrow v. Heintschel* an Ohio appeals court held similarly to *Marasco* that it was proper to apply collateral estoppel to prevent relitigation of the causation element of a legal malpractice claim. 2011-Ohio-1840, ¶¶ 22-28, 194 Ohio App. 3d 391, 397-99, 956 N.E.2d 855, 860-61. In *Woodrow* the plaintiffs argued that the attorney's negligence in failing to notify them of his withdrawal led to their default judgment. *Id*. at 395. In attempting to reinstate their case, however, the court held a Rule 60(b) hearing, where the court determined that a judge had actually granted the attorney leave to withdraw prior to the default, but the court staff had failed to send a notice to the plaintiffs. *Id*. at 398-99. The court in *Woodrow* concluded that as a factual matter, the judge at the Rule 60(b) hearing had determined that the duty to notify the pro se plaintiffs fell on the court, and thus that the court, and not the attorney, caused the default. *Id*. at 399. Thus, the court found that it was appropriate to apply collateral estoppel to prevent relitigating the causation issue in the malpractice action. *Id*.

A number of other courts have also found that a plaintiff asserting legal malpractice can assert collateral estoppel to prevent relitigating the causation element of the claim. *See Frank v. Folmer,* 2001 WL 1516724 (D. Minn. Nov. 26, 2001); *Lane v. Sullivan,* 900 F.2d 1247 (8th Cir. 1990); *Irby v. Richardson*, 278 S.C. 484, 485, 298 S.E.2d 452, 453 (1982). *Lane* and *Frank* illustrate that it is appropriate to give preclusive effect to a fact or issue that is determinative of the causation element of the legal malpractice claim when the fact or issue has been fairly and fully litigated by an attorney other than the one against whom the plaintiff brings the malpractice claim.

In *Lane v. Sullivan* the Lanes' company went into bankruptcy and was represented by Sullivan. In addition, a special panel was appointed during the bankruptcy to run the Lanes' company in the event of defaults. 900 F.2d at 1248. In the underlying litigation and the malpractice claim, the Lanes alleged that the special panel and Sullivan colluded to sell their company before the Lanes had actually transferred their holdings to the special panel. *Id*. at 1249. The owner first sued the special panel for breach of fiduciary duty, claiming they did not understand the nature of the documents that transferred their interests to the special panel. *Id*. The trial court held that the owners did indeed understand the documents, and thus he lost his breach of fiduciary duty claim. *Id*. Then, the owners sued Sullivan, alleging legal malpractice. *Id*. A federal district court ruled that the malpractice suit was precluded by collateral estoppel. *Id*. at 1251. Although the causes of action of the two cases were different, the issue of understanding the transfer documents was essential to both the fiduciary claim against the special panel and the malpractice claim against Sullivan; since the earlier suit established that the owners understood the documents they signed, the plaintiff was estopped from establishing they would have received a better outcome in the sale of his business but for the attorney's negligence. *Id*. at 1250-51. The court in *Lane* cautioned that application of collateral estoppel in the case did not suggest a broad rule of law, and should be viewed in the light of a few considerations, including that on the record before the court, they were "convinced that the Lanes [had] had the opportunity to litigate this issue [to which they gave preclusive effect] and lost on the merits by particular specific findings." *Id.* at 1253 (8th Cir. 1990).

Similarly, in *Frank v. Folmer* the court found the plaintiffs were collaterally estopped from relitigating the causation element of their malpractice claim, and, like in *Lane*, the issue to which the court gave preclusive effect had been fully and fairly litigated while the plaintiff was

26

represented by new counsel. No. CIV. 00-48 (JRT/RLE), 2001 WL 1516724, at *3-5 (D. Minn. Nov. 26, 2001) *aff'd,* 44 F. App'x 36 (8th Cir. 2002). In *Folmer*, a lawyer represented the plaintiffs in the purchase of real estate, and then represented them in a misrepresentation claim related to the property. *Id*. at *1-2. The lawyer settled the claim, but after the settlement, the plaintiffs defaulted on their payment and hired a different lawyer to bring a misrepresentation claim again. *Id*. at *2. The court dismissed the suit, finding no misrepresentation had occurred. *Id*. Then, plaintiffs brought a malpractice suit against the first attorney, alleging he was negligent in advising them to settle their first misrepresentation claim. *Id*. at *3. The district court found that the issues material to proving the causation element of the legal malpractice claim had been fully and fairly decided in the prior trial, and thus collateral estoppel applied. *Id*. at *5. The Eight Circuit affirmed, reasoning that the plaintiffs' malpractice claim was dependent upon proving they had a viable legal misrepresentation claim; since that issue had been fully litigated in the trial in which a different lawyer represented the plaintiffs, and the court had found no misrepresentation, the plaintiffs were barred by the doctrine of collateral estoppel from relitigating the causation element of their legal malpractice claim. *Frank v. Folmer*, 44 F. App'x 36, 38 (8th Cir. 2002).

In the case *sub judice*, just as in *Lane* and *Folmer*, Plaintiff is collaterally estopped from proving that but for Defendants' conduct, he would have avoided an adverse monetary judgment and prevailed on his counterclaims. Those precise issues were fully and fairly litigated in the subsequent 2011 trial, with new counsel and unconstrained by the effects of discovery sanctions, and Plaintiff lost. The circumstances in this case are rare: Scherer was given a full and fair second opportunity to challenge the Bank One's trust accounting—on which the $6.2 million judgment against Scherer was based—and to litigate for the first time the counterclaims initially

27

barred by discovery sanctions. Further, in the second trial, Plaintiff and the other beneficiaries had new counsel, and were completely unconstrained by any discovery sanctions or other impediments which allegedly flowed from Defendants' misconduct. Just as in *Lane* and *Folmer*, there can be no doubt in this case that the alleged negligent behavior of the Defendants did not taint the outcome of the second trial; thus, the facts and issues fully litigated in the second trial have preclusive effect as to the causation element of this legal malpractice claim.

Plaintiff contends that the precise issue—whether the Defendants committed malpractice—has not been litigated, and thus collateral estoppel does not apply. This misrepresents Ohio law, which states that issue preclusion "precludes the relitigation, in a second action, of an issue that had been actually and necessarily litigated and determined in a prior action that was based on a different cause of action." *State ex rel. Nickoli v. Erie MetroParks*, 2010-Ohio-606, ¶ 21, 124 Ohio St. 3d 449, 453, 923 N.E.2d 588, 592. Under issue preclusion, therefore, as opposed to claim preclusion, this court must give preclusive effect to the outcome of the counterclaims and final accounting for the purposes of the causation element of this legal malpractice claim. *Lane* and *Folmer* support this conclusion. Both of those cases gave preclusive effect to a an issue determined in a prior proceeding, which addressed claims other than the attorney's negligence, in order to conclude that the plaintiff could not establish the causation element of the malpractice claim.

Plaintiff also attempts to argue that Mr. Good, the attorney who represented him and the other beneficiaries in the second suit, was negligent in the litigation of the 2011 trial, and that his negligence can be imputed to the Wiles firm because had it not been for Wile's negligence, the beneficiaries would not have hired Mr. Good. This reasoning is too attenuated. This Court follows the rationale in *Perks v. Lauto & Garabedian*, 306 A.D.2d 261, 760 N.Y.S.2d 231

28

(2003). In that case, plaintiffs claimed that the attorney-defendants failed to investigate adequately the assets and insurance coverage of the driver whose vehicle was involved in a collision with the vehicle of the plaintiff. *Id*. at 261-62. The court found, however, that prior to settling their claim, the plaintiffs discharged the attorney and hired new counsel. *Id*. at 262. Thus, the court held that "[u]nder such circumstances, subsequent counsel had a sufficient opportunity to protect the plaintiffs' rights, and any negligence by the appellants was not the proximate cause of the plaintiffs' alleged damages." *Id*. (citations omitted). In this case, the new attorney responsible for the 2011 trial was given a sufficient opportunity to protect his client's rights, and it cannot be said that Defendants' negligence was the proximate cause of Plaintiff's losses in the second trial. If Plaintiff takes issue with his subsequent attorney's representation in the second trial, Plaintiff's recourse lies in a malpractice case against that attorney.

As fully explained above, absent proof that Plaintiff could have prevailed in his counterclaims and defended against Bank One's final accounting, which led to the $6.2 million judgment against him, Plaintiff cannot succeed on the case-within-a-case element of his malpractice claim. If only the 2007 had occurred, this Court would be unable to say that Wiles' alleged malpractice did not cause the adverse judgment against him. In the context of the second trial, however, where Plaintiff was represented by new counsel and had a full and fair opportunity to litigate his claims and defenses, collateral estoppel precludes the relitigation of his claims and defenses in order to prove the causation element of his malpractice claim.

### b. Privity

Plaintiff disputes that he was in privity with the other beneficiaries in their litigation of the counterclaims during the 2011 trial, and thus argues that he is not precluded from relitigating those claims for the purpose of proving causation in his legal malpractice claim. It is undisputed

that for claim preclusion to apply, the parties to the subsequent suit must either be the same or in privity with the parties to the original suit. *O'Nesti v. DeBartolo Realty Corp.*, 2007-Ohio-1102, ¶ 9, 113 Ohio St. 3d 59, 61, 862 N.E.2d 803, 806.

As explained *supra*, the Defendants originally filed the counterclaims on behalf of all beneficiaries, including Scherer, but the probate court subsequently stuck them as to all beneficiaries as a discovery sanction. The Ohio Court of Appeals later held that the other beneficiaries, excluding Scherer, should be afforded an opportunity to bring the counterclaims, since the counterclaims were barred due Scherer's misconduct primarily. *Id*. at * 15. Thus, in the 2011 trial, Scherer was without question a party to the objections to the final accounting; he was not, however, a party to the counterclaims.

Defendants respond that since Plaintiff directed and controlled the 2011 litigation, privity existed between Plaintiff and the other beneficiaries, and thus the disposition of the counterclaims has a preclusive effect in this malpractice case. Plaintiff retorts that the test for privity is "actual control," and since he was only an intermediary and not a party with a legal interest, and since Attorney Good did not heed his recommendations, it cannot be said that he had actual control of the litigation.

In their briefing and at oral argument, both Defendants and Plaintiff relied on federal law to define the parameters of "privity" in the context of claim preclusion.[2] As stated *supra*, federal

---

[2] Under Sixth Circuit law, there are three categories of privity: "First, those who are *successors in interest* to a party will be bound by a judgment against that party. Second, a nonparty who *controlled* the original suit will be bound by the resulting judgment. Third, a nonparty who is *adequately represented* by a party will also be precluded from relitigating the same issues." *Becherer v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 193 F.3d 415, 422 (6th Cir. 1999). *Becherer* determined further, that whether the court applies the "control" test or the "adequate representation" test, "minimum standards of due process require that, in order to be claim precluded, a nonparty must (A) have actual control over the first litigation, (B) be able to hold the first party or its attorney legally accountable for the result in the first action, or (C) be able to

courts sitting in diversity must look to the law of the rendering state to determine to what extent a

prior judgment should receive preclusive effect. *Abbott,* 474 F.3d at 330. Thus, we look to Ohio

law to determine whether Plaintiff was in privity with the other beneficiaries in the 2011 trial,

such that the disposition of the counterclaims in the 2011trial has a preclusive effect on

Plaintiff's legal malpractice claim. The Ohio Supreme Court has clarified the modern rule of

privity in the context of collateral estoppel as follows:

> Privity was formerly found to exist only when a person succeeded to the interest
> of a party or had the right to control the proceedings or make a defense in the
> original proceeding. *Whitehead v. Gen. Tel. Co.* (1969), 20 Ohio St.2d 108, 114,
> 49 O.O.2d 435, 254 N.E.2d 10, overruled in part on other grounds, *Grava,* 73
> Ohio St.3d 379, 653 N.E.2d 226. An interest in the result of and active
> participation in the original lawsuit may also establish privity. *Id*. Individuals who

---

rescind its express or implied consent to being represented by the first party if it deems its
interests diverge sufficiently early in the litigation." *Id*. at 423. Both Plaintiff and Defendants
agree that *Becherer* also held that " '[t]o have control of litigation requires that a person have
effective choice as to the legal theories and proofs to be advanced in behalf of the party to the
action. He must also have control over the opportunity to obtain review." *Id*. at 423. Examples of
relationships providing such sufficient control include "president/sole shareholder and his or her
company, a parent corporation and its subsidiary, an indemnitor and its indemnitee, or a liability
insurer and an insured." *Id.* Examples of relationships providing insufficient control include
"supplying an attorney, helping to finance the litigation, testifying as a witness, participating in
consolidated pretrial proceedings, and even making limited presentations to the court." *Id*.

Plaintiff contends that he did not have actual control because he served merely as a
representative, and had no legal interest in the litigation. Further, Plaintiff argues that Attorney
Good did not heed his instructions, and thus he did not have effective choice as to the legal
theories and proofs. As already stated, this Court need not apply Sixth Circuit law. Nonetheless,
privity likely would exist under the law of this Circuit. This Court explains in the analysis under
Ohio law that this case represents a rare circumstance, in which all defendant-beneficiaries
initially brought counterclaims pursuant to their common interests, which was subsequently
stricken only as to one of them, the Plaintiff. Then, it an even rarer turn of the events, Plaintiff,
the one beneficiary who no longer was a party to the counterclaim, was appointed with the full
consent of the other beneficiaries as their solitary representative in the litigation of the
counterclaims. Thus, it cannot be said that Plaintiff did not have actual control, as he was
effectively deputized to take the role of a party in the case. That Attorney Good did not
ultimately heed Plaintiff's instruction is fodder for a malpractice claim; it does not undermine his
ability to control the litigation. Further, it cannot be said that the other beneficiaries did not
adequately represent Plaintiff, as he was in fact the party that represented them, and thus he
represented himself for the purposes of privity.

> raise identical legal claims and seek identical rather than individually tailored
> results may be in privity. *Brown v. Dayton* (2000), 89 Ohio St.3d 245, 248, 730
> N.E.2d 958. This court has since stated that privity is a somewhat amorphous
> concept in the context of claim preclusion. *Kirkhart v. Keiper,* 101 Ohio St.3d
> 377, 2004-Ohio-1496, 805 N.E.2d 1089, ¶ 8, citing *Brown,* 89 Ohio St.3d at 248,
> 730 N.E.2d 958. A "mutuality of interest, including an identity of desired result,"
> might also support a finding of privity. *Brown* at 248, 730 N.E.2d 958.

*O'Nesti*, 113 Ohio St. 3d at 61-62 (finding no privity among employees in a prior suit, who had

obtained judgment against their common employer based on employer's failure to distribute

deferred stock following its merger with a subsidiary, and employees in a subsequent suit

seeking the same relief, where the only commonalities between the employees in the subsequent

suit and the prior suit were their employment at the same company and being subject to the same

stock incentive plan; further, the employees in the subsequent suit sought individually tailored

suits and had not participated in the prior lawsuit); *Buckeye Ret. Co., L.L.C. v. Busch,* 2011-

Ohio-1125, ¶ 21, 2011 WL 846687 (finding no privity under the rule in *O'Nesti* because there

was no evidence that the defendant either actively participate in, or had control over, the prior

law suit).

    This Court finds that Plaintiff was in privity with the beneficiaries by his active

participation in, if not control of, the 2011 trial and litigation of the counterclaims, and his

common interest in the outcome of the same. Prior to the 2011 trial, the court held a conflict of

interests hearing to determine whether Attorney Good was able to represent both the Plaintiff and

the other beneficiaries at the 2011 trial. At that hearing, the court found that all defendants

executed a Conflict of Interest Waiver Agreement, which stated the following:

> The Beneficiaries have determined that it is in their collective best interests to
> appoint a representative to interact with, receive information from, and to help
> plan and coordinate strategy during the Litigation with [defense counsel]. The
> Beneficiaries have appointed Ronald E. Scherer, Sr., to perform these functions. .
> . . By signing this Waiver of Conflict, each of the Beneficiaries has affirmed their

selection of Ronald E. Scherer, Sr. to represent each of them as intermediary with [defense counsel.].

*Remand Proceedings, Defendants' Exhibit G*, at p. 36, ¶ 128. In addition, the court found that all defendants "voluntarily agreed to stand by their father [and brother] in this action in all respects so that there is complete commonality of interests among [themselves], acting as 'one family'" and/or as "a unified group …with a common purpose" and "common interest." *Id.* at p. 39, ¶¶ 139-41. After that hearing, all defendants jointly filed their "Objections to Plaintiff Bank One Trust Company, N.A.'s Final Accounting," and the other beneficiaries, with the Plaintiff as their sole representative, pursued litigation of their common counterclaims—the same as those Plaintiff claims he would have won but for the Wiles firm's representation in the 2007 trial. According to the record, Plaintiff primarily interacted with Mr. Good, and only he attended part of the trial.

The findings of the probate court, as well as uncontroverted facts which show Plaintiff did in fact serve as the representative of all beneficiaries in the 2011 litigation, establish that he actively participated in, if not controlled, all aspects of the 2011 trial inasmuch as any party controls the litigation of his claims when represented by counsel. There is no assertion that any other beneficiary played any role at all in the litigation, let alone any larger role than Plaintiff. Further, there is no assertion that the other beneficiaries overrode or interfered with Plaintiff's decisions or assistance pertaining to the 2011 trial. Thus, as the representative of the other beneficiaries, Plaintiff was, for all practical purposes, the party overseeing the beneficiaries' case. Plaintiff's only argument against a finding of privity is that Attorney Good did not heed his direction concerning matters such as which witness to call. This argument is not well taken. If Plaintiff had in fact been a legal party to the counterclaims, he would not be able to defeat application of collateral estoppel simply by arguing that his attorney did not heed his direction.

Plaintiff nowhere contends that the other beneficiaries prevented him from terminating Attorney Good. Thus, that Attorney Good did not ultimately heed his instructions may be grounds for a malpractice claim, but does not undermine Plaintiff's technical ability to control the litigation for the purposes of finding privity.

Further, the probate court's findings as well as uncontroverted facts establish that Plaintiff had a common interest with the other beneficiaries in the resolution of the counterclaims. A finding that Bank One breached its fiduciary duties as the trustee to the shared family trust would have vindicated the rights of all beneficiaries, including Plaintiff's. In addition, any money judgment related to such a finding ostensibly would have inured to the benefit of the trust in its totality. In other words, Scherer shared an identical interest with the other beneficiaries in the outcome of the counterclaims. Scherer also had a legal interest in winning the counterclaims for the purposes of any future legal malpractice claim.

The Ohio Supreme Court explained in *Brown* that, "[a]s a general matter, privity 'is merely a word used to say that the relationship between the one who is a party on the record and another is close enough to include that other within the *res judicata*.' " 730 N.E.2d at 962. In that case, the court found that a mutuality of interest, including identity of desired result, created privity between the plaintiffs in the case before it and those in a prior case. *Id.* All plaintiffs sought the disallowance of the same ordinance, and all for the same reason. *Id*. Accordingly, the court found that their legal interests were the same, and they were in privity with one another. *Id*. In this case, which by any measure is factually rare, Plaintiff initially was a party to the counterclaims, as a beneficiary to the same trust, and would have continued to be a party to the counterclaims but for the discovery sanctions. Thus, it cannot be said that Plaintiff did not have

an identical interest in the outcome of the counterclaims, although such counterclaims no longer could be brought in his name.

Plaintiff's counsel contended at oral argument that Scherer could not be said to have had an interest in the litigation of the counterclaims because he was precluded, by the discovery sanctions, from sharing a legal interest in them. Due to the rare factual circumstances of the probate case, Scherer was not able to—and under collateral estoppel, will never be able to—bring the identical counterclaims in his own interest. Though not controlling, the Supreme Court's rationale in *Montana v. United States* 440 U.S. 147 (1979) is persuasive and applicable here. In *Montana* the Court explained that the interests underlying collateral estoppel—"to preclude parties from contesting matters that they have had a full and fair opportunity to litigate," which "protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions"—are implicated when:

> [n]onparties assume control over litigation in which they have a direct financial or proprietary interest and then seek to redetermine issues previously resolved. . . the persons for whose benefit and at whose direction a cause of action is litigated cannot be said to be "strangers to the cause. . . . [O]ne who prosecutes or defends a suit in the name of another to establish and protect his own right, or who assists in the prosecution or defense of an action in aid of some interest of his own . . . is as much bound . . . as he would be if he had been a party to the record. . . . Preclusion of such nonparties falls under the rubric of collateral estoppel rather than res judicata because the latter doctrine presupposes identity between causes of action. And the cause of action which a nonparty has vicariously asserted differs by definition from that which he subsequently seeks to litigate in his own right. . . .

440 U.S. at 154-55 (quotation marks and citations omitted). Here, under no other circumstance could it be said that someone who was not a party to a claim had a more fair and full opportunity actively to participate in the litigation of a claim in which he shared a common interest.

Thus, this Court finds Plaintiff was in privity with the other beneficiaries in the litigation of the counterclaims for the purposes of collateral estoppel.

### c.  Defensive Non-Mutuality Doctrine

Defendants contend that, under Ohio law, where collateral estoppel is invoked defensively, only the party against whom issue preclusion is applied must have been a party to the underlying action. *Scherer v. JP Morgan Chase & Co.*, 508 F. App'x 429, 435 (6th Cir. 2012) (citing *McCrory v. Children's Hosp.,* 28 Ohio App.3d 49, 501 N.E.2d 1238, 1244 (1986); *Schroyer v. Frankel,* 197 F.3d 1170, 1178 (6th Cir.1999); *McAdoo v. Dallas Corp.,* 932 F.2d 522, 525 (6th Cir.1991)). This is known as the defensive non-mutuality doctrine of collateral estoppel.

Plaintiff responds that Ohio law requires complete identity of all parties in the prior action in order to evoke collateral estoppel, and thus does not follow the non-mutuality defensive principle of collateral estoppel. Plaintiff relies on *Goodson v. McDonough Power Equipment*, which held that, generally, there must be an identity of persons and parties, or their privies, within the prior proceeding in order for a judgment or decree to act as an estoppel. (1983), 2 Ohio St.3d 193. Plaintiff contends that *Goodson* has never been overturned and thus still is good law.

Plaintiff ignores that in *Goodson* the Ohio Supreme Court acknowledged that there may be exceptions to the general requirement of mutuality when the plaintiff had a "full and fair opportunity" to litigate the issue in the first action. *Carpenter v. Long*, 2011-Ohio-5414, ¶ 30, 196 Ohio App. 3d 376, 387, 963 N.E.2d 857, 865. As explained in *Carpenter*, after *Goodson*, Ohio appellate courts have interpreted the exception in *Goodson* broadly, and the consensus is that *Goodson* "eliminates the mutuality requirement if the party against whom collateral estoppel

is asserted has had his day in court in a prior action and, in that forum, was permitted to fully and fairly litigate the specific issue raised in a later proceeding." *Id.* at 388. *Carpenter* also noted that in more recent cases, the Ohio Supreme Court has adopted a three-part test for collateral estoppel, which states, as the third prong, that collateral estoppel applies when: "the party against whom collateral estoppel is asserted was a party [or] in privity with a party to the prior action." *Id*. at 389 (citing *New Winchester Gardens, Ltd. v. Franklin County Bd. of Revision*, 80 Ohio St.3d 36, 41, quoting *Thompson v. Wing*, 70 Ohio St.3d 176, 183)). Thus, as *Carpenter* and other Ohio appellate courts have concluded, non-mutual defensive collateral estoppel applies in Ohio when a party against whom the doctrine is asserted had his day in court and was permitted to litigate fully the specific issue sought to be raised in a later action. *Id*. at ¶ 39; *see also Woodrow v. Heintschel*, 2011-Ohio-1840, ¶¶ 22-28, 194 Ohio App. 3d 391, 397-99, 956 N.E.2d 855, 860-61.

In this case, there is no question that the Plaintiff, in privity with the other beneficiaries, was afforded a fair and full opportunity to litigate the counterclaims and the final accounting in the 2011 trial. Thus, collateral estoppel properly is invoked defensively, and complete mutuality of the parties is not required.

As all elements of collateral estoppel have been met, Plaintiff cannot prove the causation element of his legal malpractice claim. Accordingly, Defendants' motion for summary judgment on Plaintiff's legal malpractice claim is **GRANTED**.

### B.  Plaintiff's Motion to Strike Portions of Defendants' Reply Brief and to Deem Waived as a Matter of Law Defendants' Statute of Limitations Defense

Plaintiff alleges that Defendants argue in their reply brief for the first time that Plaintiff's counterclaims relating to investments in National Wholesale Drug Company and Unimag are time-barred by the statute of limitations. As this Circuit disfavors the raising of a defense for the

first time in a reply brief on summary judgment, Plaintiff urges this Court to strike the portions of Defendants' reply brief referring to the statute of limitations defense.

Defendants respond that they did not argue in their reply brief for the first time that the counterclaims relating to investments in National Wholesale Drug Company and Unimag were time-barred. Instead, their intention in their reply brief was to clarify that since the probate court in the 2011 trial held that those counterclaims were time-barred, Plaintiff was collaterally estopped from relitigating such counterclaims. Thus, in their reply brief Defendants simply added more detail as to why the trial court found meritless each counterclaim in order to bolster their collateral estoppel argument.

Defendants' argument is well taken. Accordingly, this Court holds that Defendants did not advance new legal arguments in their reply brief, but only added more support to a previously raised argument. Plaintiff's motion is **DENIED**.

### C.     Plaintiff's Motion for Sanctions and Default Judgment Based on Defendant's Misconduct and Request for Evidentiary Hearing

Plaintiff urges this Court to grant a default judgment in his favor as the appropriate sanction for Wiles' alleged misconduct relating to Plaintiff's sole expert witness, Edgar Boles, Esq., a few days prior Boles' to his deposition. Plaintiff explains that Stanley Jaros, managing partner of the firm Moriarty & Jaros, is Wiles' cousin, and that Plaintiff's expert, Boles, is a lawyer in the Moriarty & Jaros firm and a close friend of Jaros. Plaintiff states, and Defendants do not deny, that on Tuesday June 23, 2015, Wiles called Jaros, and expressed anger that a Moriarty & Jaros lawyer would testify as an expert in a case against him and his firm. Wiles told Jaros that such testimony had the effect of harming his health.

The next morning Jaros approached Boles. In Boles' deposition, at the close of Defense counsel's questions, Plaintiff's lawyer, Mr. Levin, asked Boles to recount the conversation Jaros had with him regarding Wiles' phone call the night before:

> Q (Levin): Did Mr. Jaros have a discussion with you this week about your serving as an expert witness in this case?
> A (Boles): Wednesday morning he told me that – he said, Jim Wiles is my first cousin, and Jim Wiles called me last night at 11 o'clock and he's very upset that a lawyer in the Moriarty & Jaros firm is one of the expert witnesses against him. He said it's affecting his health.
> Q: Mr. Wiles said it was affecting his health?
> A: That's what he said to me, and that was about – the conversation we just had was about 100 percent of the conversation.
> Q: And did Mr. Jaros then talk to you about this?
> A: No. He just said, you know, I don't like these kinds of cases. I said, I understand.
> Q: Was he angry with you?
> A: He was angry.
> Q: And what has your relationship been in the last day or two since that –
> A: Wednesday was chilly in our conversations and Thursday we barely saw each other … and then today, of course, I was down here first thing this morning and I haven't seen him today.
> Q: From your understanding of the conversation as it was related to you, do you have any understanding as to whether Mr. Wiles was trying to intimidate you as a witness by calling your colleague?
> A: I can't say I know what Mr. Wiles was or was not trying to do, that would be a stretch, but I just found it inappropriate and I just can't imagine why he would do what he was doing except for gain.
>
> ***
>
> Q: Do you have any view one way or another as to whether this was an attempt to chill your testimony?
> A: I don't know. I don't know.

Boles Deposition, Doc. 67-1, pgs. 176-177, 180.

Plaintiff argues that such an interference and attempted intimidation cannot help but chill Bole's testimony. Plaintiff contends that witness intimidation requires the sanction of a default judgment, as the real prejudice to Plaintiff is irreparable.

A district court may impose sanctions pursuant to statute, or pursuant to its "inherent powers" when litigants have "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *See* 28 U.S.C. § 1927; *Chambers v. NASCO, Inc.,* 501 U.S. 32, 45, 111 S.Ct. 2123, 115 L.Ed.2d 27; *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 517 (6th Cir. 2002) (" 'A court may impose sanctions pursuant to its inherent powers only when it finds the action in question was taken in bad faith,' or conduct that is 'tantamount to bad faith.' ") (citations omitted)).  The court's "inherent powers must be exercised with restraint and discretion." *First Bank of Marietta*, 307 F.3d at 516 (citing *Chambers*, 501 U.S. at 45). Generally "a court's inherent power should be reserved for those cases in which the conduct of a party or an attorney is egregious and no other basis for sanctions exists." *Id.* at 516 (citing *Martin v. Brown,* 63 F.3d 1252, 1265 (3d Cir.1995)). A "primary aspect" of the court's inherent discretion in ordering sanctions "is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Id*. (citing *Chambers,* 501 U.S. at 44–45).

Plaintiff cites to a number of civil cases from other jurisdictions which found sanctionable witness intimidation. *See*, e.g., *Cleary Gottlieb Steen & Hamilton LLP v. Kensington Int'l Ltd.*, 284 F. App'x 826, 828 (2d Cir. 2008) (holding district court did not abuse its discretion in granting sanctions in the sum of $165,000, which represented plaintiff's attorney's fees in bringing the motion for sanctions, due to its finding that defense attorneys had sought "to delay or obstruct the post-judgment discovery process" by "attempt[ing] to dissuade a non-party witness from attending a post-judgment deposition..."); *Ty Inc. v. Softbelly's Inc.*, 353 F.3d 528, 537 (7th Cir. 2003) (finding it was reversible error to preclude the jury from hearing testimony that an opposing party directly lobbied a witness to dissuade him from providing testimony, and finding that if such allegations were substantiated it would require "a

commensurately severe sanction, quite possibly dismissal...”); *Harlan v. Lewis*, 982 F.2d 1255, 1257 (8th Cir. 1993) (upholding the grant of a $2,500 sanction against defense attorney for telling a non-party witness that he could be called as a witness at trial or be sued, because such conduct obstructed another party’s access to evidence under the Model Rules of Professional Conduct); *Synergetics, Inc. v. Hurst*, 2007 US Dist. Lexis 61286 (E.D.Mo. Aug. 21, 2007) (finding that by providing something of value to defendant’s third-party witness—an agreement not to bring suit against him as well—in exchange for his decision not to testify, plaintiff had engaged in “witness tampering”, which warranted awarding $1.17 million in sanctions, or one-half the total damages awarded); *Massachusetts Inst. of Tech. v. Imclone Sys., Inc.*, 490 F. Supp. 2d 119, 127 (D. Mass. 2007) (finding facts showing opposing counsel had contacted a witness’ employer to have the employer “lean on [the witness] to cease cooperating” warranted sanctions in the form of permitting plaintiff to offer evidence of attorneys' improper conduct to lay foundation for instruction permitting jury to draw inference that defendant believed that expert's test results supported plaintiffs' claims in litigation, and reimbursing plaintiffs for reasonable costs and attorney fees it incurred in prosecuting motion for sanctions).

Defendants respond that Plaintiff has failed to establish any proof that Boles was intimidated or impacted in any way by Wiles’ conduct. There is no evidence, for instance, that Defendants ever contacted Boles directly. That being said, this court infers that Wile’s implicit intention in contacting Jaros was to impact Boles’ decision to testify to some degree, however small. Of some consideration, however, is that Boles did provide five hours of deposition testimony, and Plaintiff has not put forth evidence that Boles’ testimony was chilled in any way. Although Attorney Levin took the opportunity to question Boles during his deposition regarding the incident with Jaros, Levin never asked Boles whether his deposition testimony was chilled by

the incident. Plaintiff filed no reply to Defendants' response to contest Defendants' assertion that Boles' testimony had not been chilled. As the entire incident underlying this request for sanctions has been memorialized and sworn to in Boles' deposition, and both parties had an opportunity to question Boles, this Court finds an evidentiary hearing is unwarranted.

As explained in *Hurst*, "[w]itness tampering is an extremely serious offense, and strikes at the heart of the litigation process. Our system of justice relies on witnesses coming to court and telling the truth. Interference with the process taints trials and threatens the integrity of the justice system." 2007 WL 2422871, at *15 (citing *Harlan,* 982 F.2d at 1261).

This Court concludes that although Wiles' conduct was improper, and thus some sanction is warranted, his conduct fell below the level of egregiousness warranting a default judgment or an extreme monetary sanction. In fact, in none of the cases to which Plaintiff cites did the court grant the sanction of a default judgment. Wiles was not acting in his capacity as an attorney when he contacted Jaros, nor did he contact Boles directly. In addition, unlike in *Hurst*, which ordered a large monetary sanction, Boles did in fact testify and there is no evidence his testimony was chilled.

Therefore, following *Cleary* and *Harlan*, this Court orders Wiles to pay a monetary sanction of $5,000. This Court need not consider a sanction such as the admission of testimony at trial regarding Wiles' conduct, *see Massachusetts Inst. of Tech.*, 490 F. Supp. 2d at 127, since this Court granted Defendants' motion for summary judgment.

### V.    Conclusion

For the reasons set forth above, Defendants' Summary Judgment motion is **GRANTED**; Plaintiff's Motion to Strike is **DENIED**; and Plaintiff's Motion for Sanctions **GRANTED in part**.

**IT IS SO ORDERED.**

    **s/Algenon L. Marbley**

**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: July 24, 2015**